IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DAN CHARLESTON, | 4:14-cv-164-SMR-HCA |
| Plaintiff, | |
| vs. | |
| BILL McCARTHY, | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

Defendant Bill McCarthy ("McCarthy") filed a Motion for Summary Judgment. ECF No. [130]. Plaintiff Dan Charleston ("Charleston") responded. ECF No. [142][1]. McCarthy replied to Charleston's response. ECF No. [146]. The Court held a hearing on May 16, 2017. At the hearing, the undersigned invited the parties to submit supplemental briefing, and McCarthy submitted a supplemental brief.[2] ECF No. [157]. The Motion for Summary Judgment is before the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The Court considers this

---

[1] In his Response to Defendant's Statement of Undisputed Facts, ECF No. [145], Charleston objects or otherwise responds to multiple paragraphs without admitting, denying, or qualifying them. Local Rule 56(b) requires a resisting party to expressly admit, deny, or qualify each statement of fact. LR 56(b)(2). In addition, "[t]he failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact." LR 56(b). The Court considers as "admitted" any facts in Charleston's Response to Defendant's Statement of Undisputed Facts that Charleston did not admit, deny, or qualify, unless the paragraph explicitly denies the statement and supports the denial with record evidence. *Cf. Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 798–800 (8th Cir. 2014).

The Court further states that a fact is not inadmissible or irrelevant because it stems from an event that occurred before April 24, 2012—the outer limit of the statute of limitations period. A statute of limitations bars claims; it does not exclude relevant evidence. *See Williams v. Anderson*, 562 F.2d 1081, 1087 (8th Cir. 1977) (finding evidence outside the statute of limitations relevant to whether the court found an inference of discrimination); *cf. Bazemore v. Friday*, 478 U.S. 385, 402 (1986) (holding that evidence of discrimination from before the enactment of the Civil Rights Act of 1964 was relevant). This Court's Order Granting in Part Defendant's Pre-Answer Motion to Dismiss, ECF No. [9], did not outline a time frame for relevant evidence as Charleston suggests; it held that certain events were no longer actionable.

[2] The undersigned asked the parties to address whether the Court may consider events outside the statute of limitations period when analyzing Charleston's cumulative adverse employment action claim.

matter fully submitted on the briefing and oral arguments of the parties[3]. The undersigned respectfully recommends that the Court **grant** Defendant's Motion for Summary Judgment, ECF No. [130].

## FACTS

### Initial Undisputed Facts

This lawsuit arises out of Charleston's claims of political discrimination and retaliation while working for the Polk County Sheriff's Office. The Sheriff's Office hired Charleston as a deputy sheriff on January 20, 1997. It promoted him to sergeant in the Jail Division in December 2002. Charleston has been a sergeant at all times relevant to this Motion. Sergeants supervise other Sheriff's Office employees, along with carrying out the duties associated with their division. The Sheriff's Office transferred Charleston to the Standards and Training Division in March 2004, the Patrol Division in May 2005, the Transport Division in July 2009, the Standards and Training Division for the second time in March 2010, the Criminal Investigation Division in July 2010, the Patrol Division for the second time in March 2011, the Transport Division for the second time in March 2013, and the Court Staging Division in May 2013.

McCarthy, a Democrat, was elected sheriff in 2008. He has been the Polk County Sheriff at all times relevant to this Motion. In 2010, Charleston, a Republican, announced that he intended to run against McCarthy. Charleston asserts that Sheriff's Office employees harassed him, disciplined him, discriminated against him, and passed him over for promotions following his

---

[3] The undersigned previously ruled on Charleston's Motion to Strike Affidavits. ECF No. [143]. As a result of the Court's order, ECF No. [158], the Court will not consider the affidavit of Doug Miller as part of the summary judgment record. The undersigned also previously granted McCarthy's Motion to Amend the Knichle affidavit to correct the date stamp. ECF No. [158].

announcement due to his political views, associations, and expressions. In 2012, Charleston and McCarthy were the two major-party candidates. McCarthy was reelected sheriff that year.

### Previously Dismissed Alleged Incidents

Charleston asserted several claims for political discrimination or retaliation that the Court previously has dismissed. The undersigned mentions the facts underlying these claims only to provide a complete background.

The Polk County Civil Service Commission ("Commission") certifies lists of qualified candidates for promotions within the Sheriff's Office ("promotion lists"). The Commission ranks individuals according to their qualification for the next highest position. The 2010 lieutenant promotion list, which was effective from 2010 to 2012, ranked Charleston second. The Commission did not rank him on the 2013 lieutenant promotion list. McCarthy promoted four individuals from 2010 to 2012, including one who was not on the promotion list. Charleston claimed this off-list appointment violated Iowa Code § 321A.8. Charleston also asserted that McCarthy violated the longstanding Sheriff's Office custom to promote people in the order of their rank on the promotion list. Charleston claimed he was entitled to a promotion because he was second on the list and four people were promoted. Charleston also asserted that McCarthy allowed his subordinates to administer the promotional tests improperly or unfairly in order to keep Charleston off the 2013 promotion list.

In February 2012, Charleston served a two-day suspension related to his inaction at the roadside death of a man in Altoona, Iowa ("suspension"). Charleston arrived at the scene—where a man was lying unconscious and bleeding from the nose—shortly before the paramedics. Neither Charleston nor the other deputy present on the scene attempted to provide medical assistance. Following the incident, the Altoona Fire Chief filed a complaint regarding both officers. McCarthy

and Victor Munoz, a Sheriff's Office employee and former defendant in this case, directed the Office of Professional Standards ("OPS") to investigate. Rick Harney, Charleston's direct supervisor, recommended that Charleston receive a three-day suspension and the other deputy receive a two-day suspension. Allan Tunks, the next-highest officer in the chain of command, recommended Charleston receive a two-day suspension. Tunks did not recommend discipline for the other deputy because the deputy subsequently had retired. Charleston appealed his suspension to McCarthy, who imposed a two-day suspension. The Commission, which consisted of Helen Youngs ("Youngs"), Florence Buhr ("Buhr"), and Bill Hansen ("Hansen"), affirmed the suspension. The Medical Examiner later determined that neither Charleston nor the other deputy could have saved the deceased man. Neither McCarthy nor Munoz requested that the Commission rescind the suspension.

During the election, Doug Phillips disclosed information regarding Charleston's termination from the Pomona, California Police Department for lying in a police report to a reporter from the Des Moines Register.[4] McCarthy did not punish Phillips. The Des Moines Register published an article about Charleston on June 3, 2013. Charleston also claimed that Munoz told Chad Tingle, a former Sheriff's Office employee, that he had accessed Charleston's Commission investigation materials and intended to share them to decrease Charleston's chance of winning the election.

---

[4] The Pomona Police Department terminated Charleston for lying in a police report in 1994. Charleston contested his termination, he and the Pomona Police Department arbitrated their dispute, and the arbitrator found in favor of the Pomona Police Department. Charleston challenged the arbitrator's decision in the California Superior Court for the County of Los Angeles, but he lost there as well. *See Charleston v. City of Pomona*, No. BS 033133 (Cal. Super. Ct. Feb. 7, 1996); *see also* Ex. AA, Def.'s App. 485–89.

**Voluntarily Abandoned Claims**

The following facts relate to claims that Charleston abandoned. The undersigned mentions the facts underlying the claims now only to provide a complete background of this case's procedural history.

On January 3, 2013, Charleston wrote McCarthy a memorandum regarding Charleston's November 2012 appraisal. The memorandum disputed Charleston's scores in the "Knowledge of Work," "Relationships/Cooperation," and "Leadership" sections, but did not mention political discrimination or a traffic enforcement quota. McCarthy was unaware of Charleston's November 2012 appraisal until he received this memorandum.

McCarthy transferred Charleston twice after the 2012 election. On March 9, 2013, McCarthy transferred Charleston from the Patrol Division to the Transport Division. The undersigned will discuss this event below because it remains a claim in the case. On May 18, 2013, McCarthy transferred Charleston to a position in Court Staging. A Court Staging sergeant's typical duties involve transporting inmates from the Polk County Jail to the Polk County Courthouse for court appearances, and occasionally transporting inmates to other facilities.[5]

On October 1, 2013, McCarthy hosted a training based on a Police Executive Resources Forum ("PERF") article entitled *Critical Issues in Policing* to review protocols in the Jail and Patrol divisions.[6] He invited members of the command staff (Lieutenants and above) and sergeants on the Polk County Civil Service Commission Certified Lieutenant List from the Jail and Patrol divisions. The committee discussed ways to run the Sheriff's Office constitutionally and professionally. Charleston was not invited.

---

[5] As a sergeant, the Sheriff's Office also would require Charleston to supervise deputies under him, including doing payroll and performance evaluations.

[6] Charleston's Amended Complaint refers to this training as the "DOJ Training." This Report and Recommendation will refer to it as the "PERF training" in light of the fact that it was not put on by the DOJ.

## Additional Undisputed Facts[7]

From December of 2012 to the summer of 2012, various Sheriff's Office employees spoke with Richard Peters, the owner of Peters Towing, and Cindy Wilson, a Peters Towing employee, about a sign outside Peters Towing supporting Charleston for sheriff. The Polk County General Services Department set up a public bidding process to receive Polk County's towing business. Peters Towing previously had towed for Polk County, but it did not submit the winning bid. Peters Towing stopped doing business with the Sheriff's Office and has since gone out of business.

On October 1, 2012, Charleston and McCarthy debated each other in front of a crowd at North High School. Charleston asserts that McCarthy called him "dangerous" at the debate. The transcript of the debate uses the word "dangerous" three times. The first and second times refer to the general danger associated with law enforcement. Debate Tr. 38:4, 48:19, App. 398, 400. The third refers to the danger associated with automatic weapons. *Id.* at 62:4, App. 403. McCarthy does not refer to Charleston or his beliefs as dangerous.

Charleston also asserts that McCarthy told the crowd Charleston was "as radical as it gets," compared him to Timothy McVeigh, and called his views "garbage." The relevant portion of the transcript reads:

> McCarthy: But then the other day I opened his website up and he's got a reference on there, the Oath Keepers. Oath Keepers. It's a group that is affiliated with this, but they're the big boys. These are people on a patriot's list from the [Southern] Poverty Law Center where they are on a watch list for extreme radicalism.
> McCarthy: McVey—McVey died going to his grave saying he was that kind of patriot. This guy that runs the Oath Keepers movement who says he's a constitutionalist has now come out on his website and said, "It's time to arm because we think Obama might win. It's time to arm and it's also time to store food for the war that's coming."
> McCarthy: This is the kind of garbage that you're going to get if he's elected.
> Moderator: Hey, folks.

---

[7] To the extent that other facts are relevant to the undersigned's analysis of the legal claims, they will be noted in the analysis and discussion segment of the report and recommendation.

McCarthy: This is about as radical as it gets.

*Id.* at 70:5–25, App. 406.

Charleston also asserts that McCarthy stated he would not promote Charleston due to Charleston's political beliefs while the candidates debated the selection process for determining who would be hired or promoted.

> Moderator: Iowa Code 341A is the cornerstone of the office of sheriff. The law provides regulations for hiring, firing, and promotion of employees within the sheriff's office. What will you do as sheriff to ensure that this law is upheld?
> . . .
> Charleston: First of all, I won't allow the law to be broken.
> . . .
> I've been a victim to it myself. Three out of the last four years I've tested number one for lieutenant. I'm still a sergeant.
> . . .
> Moderator: Thank you. Next, back to Bill, same question.

*Id.* at 17:18–18:20, App. 392–93.

McCarthy explained the selection process and responded, " . . . and, you know, sometimes when people don't get promoted, there's a reason behind that too." *Id.* at 20:20–21, App. 393. McCarthy did not mention Charleston's political beliefs.

On November 6, 2012, McCarthy won the election. In mid-November 2012, Charleston directly contacted three Sheriff's Office employees: Brian Anderson, Mark Russo, and Tom Griffiths. The parties dispute the content of these conversations, but each employee reported Charleston's contact to either their supervisors or a Teamsters Local Union 238 ("Union") representative.

On November 27, 2012, James Brown, Charleston's direct supervisor at the time, rated Charleston a 2.14 on a scale of 1 ("Needs Improvement") to 3 ("Exceeds Expectations") on his

yearly performance appraisal.[8] In the "Specific Performance Objectives" section of the appraisal, Brown wrote, "I would like to see Sgt. Charleston take a more proactive approach as it comes to Patrol functions and duties which also include traffic enforcement." Ex. A, App. 163. Charleston was not disciplined as a result of this appraisal, nor was he required to complete remedial training. Charleston received a merit-based raise in 2012.

On December 6, 2012, Charleston and McCarthy had a one-on-one meeting to "clear the air" following the election. The pair discussed several of the issues brought up on the campaign trail, including the fact that they did not believe the deceased man's estate would sue Polk County or Charleston and the other deputy. They also discussed Charleston's termination from the Pomona Police Department for lying in an official police report, which McCarthy had not known before the election. McCarthy expressed uncertainty whether the law required him to disclose to criminal defendants the findings that Charleston was untruthful in the past.

During that meeting, McCarthy told Charleston that he would not allow Charleston to be a "shadow sheriff."

> McCarthy: You're not going to be a shadow sheriff and be here and survive in this office. You're not going to be the spokesperson for the rank and file, and you're not going to talk against policies in this administration and get by with it. I'm going to hold you accountable to the general orders, and you're going to have some difficult road ahead if you can't fall in and just act as a sergeant and support the administration.

Tr. of Dec. 6, 2012 Meeting 34:1–9, App. 376.

> McCarthy: You're going to be talked to by internal affairs shortly about some of the things that you've done to undermine here since the election so you need to cooperate with that, and you need to understand you're going to be held accountable to the standard that's outlined in the rules and regulations.

---

[8] All Sheriff's Office employees receive yearly appraisals scoring their performance and providing feedback near the anniversary of the date they were promoted to their current rank. Charleston usually received his appraisals around November of each year. In 2005, Charleston scored a 2.128. In 2006, he scored a 2.81. In 2007 and 2008, Charleston scored a 2.73. In 2009, he scored a 2.5. In 2010, he scored a 2.47. Charleston did not receive a Performance Evaluation score in 2011. In 2013, Charleston scored a 2.6.

> You're not the shadow sheriff, and I say that again, and you're not going to
> be viewed that way.

*Id.* at 36:4–12, App. 376.

The pair also discussed whether McCarthy was attempting to force Charleston out of law

enforcement due to Charleston's Pomona termination.

> Charleston: So is it your intention to try to get me out of law enforcement? Is that
> what you're saying?
> McCarthy: No, I'm asking you to think about it and resign, and I assume you're not
> going to do that, but I also agree with your attorney that there's sufficient
> time passed. I'm just saying I've never been around somebody in that
> position, Dan. You shouldn't be here and you shouldn't be in law
> enforcement. Your word is no—is not something that we can depend on
> now.

*Id.* at 26:6–17, App. 374.

McCarthy also told Charleston he has been "a cancer . . . for 18 months."

> Charleston: That you have an open door policy and if you've got the balls or guts
> to come in—
> McCarthy: You're connecting some different comments, Dan, and you weren't in
> there so you don't know what was said.
> Charleston: Okay.
> McCarthy: You're making a distinction like Facebook versus, you know, the other.
> It's—I don't—I hope you can fit in, but if you can't, I'm going to take the
> appropriate action.
> Charleston: I don't think you really mean that, Sheriff.
> McCarthy: Well, I mean exactly what I say and I meant it all along, but I know
> you're like a cancer in this building, and you have operated that way for 18
> months.
> . . .
> McCarthy: . . . And I say again in conclusion, you have a place here if you'll just
> accept the position you have and make the best out of that.

*Id.* at 37:5–38:9, App 377.

In January 2013, the Union notified the Polk County Human Resources Department that

Charleston's November 2012 contact with Anderson, a Union Steward, violated Chapter 20 of the

Iowa Code. The OPS investigated all three of Charleston's employee contacts by interviewing

Charleston and the three officers. OPS drafted a report summarizing its findings. While Charleston characterizes the content of the conversations with Anderson, Russo and Griffiths in a more positive light, he does not dispute that the Union raised the issue or that the OPS investigation resulted in the findings set forth in the report.

The supervisors in Charleston's chain of command reviewed the OPS report, made findings, and recommended discipline. Leesa Shoemaker investigated and found Charleston interfered with other employees, violated Chapter 20, and was untruthful. She recommended the Sheriff's Office (1) counsel Charleston for interfering with other employees, (2) suspend him for three days for violating Chapter 20, and (3) terminate him for lying. Greg Peterman found Charleston interfered with other employees, violated Chapter 20, was uncooperative with an investigation, and withheld information. He recommended the Sheriff's Office (1) suspend Charleston for three days for interfering, (2) demote him or terminate him for violating Chapter 20, and (3) remove him from management for being uncooperative with the investigation and withholding information. James Brown found Charleston violated numerous provisions of the Sheriff's Office General Orders, violated Chapter 20, and was untruthful. He recommended demotion and a five-day suspension.

McCarthy met with Charleston on February 15, 2013, to discuss the supervisor's recommendations. During the meeting, McCarthy admitted that he had previously told Charleston that he would attempt to "decertify" him, or force him out of law enforcement.

> McCarthy: Okay what should I do about [these OPS recommendations]?
> Charleston: I think the decision's already made, been made Sheriff, I know, I know basically what what you want to do so if this is part of the process, it's part of the process.
> McCarthy: What is it that I want to do Dan?
> Charleston: You want, you wanna, you've already told me that in past meetings that I'm cancerous, I'm a liar, you don't trust me, you want to decertify me, that's just part of your process. So I understand that.

> McCarthy: I have said those things and but I also tell you that I have mixed feelings and I maintain there is a place here for you even with that background that you have that I believe should prohibit you from being in law enforcement, but you're here.
>
> Charleston: Right.
>
> McCarthy: That's a reality. And I don't want to be unfair with you either and I want to give you an opportunity to have this job and flourish, you've got the job, it's your job, it's not my job, but you're not going to maintain that job if you can't act supportive in particularly in the role that you've got as a supervisor. You're not going to be the representative of the rank and file, you're not going to run your own Sheriff's Department and you're not going to constantly try to undermine, for whatever purposes that you have in mind or have had in mind, to try to undermine the direction of this administration and be successful.

Tr. of Feb. 15, 2013 Meeting, App. 295–96.

On February 20, 2013, McCarthy issued Charleston a Letter of Reprimand ("reprimand") for violating the Sheriff's Office General Orders concerning harmony within the office. The Sheriff's Office considers a reprimand formal discipline, but the reprimand did not affect Charleston's pay. The reprimand read, in part:

> It is even more troubling that you stated 10 times during your OPS interview that you "could not remember or recall" what was said in the subject conversation. You were generally able to remember the conversation, the context of the conversation and the early part of the conversation. When it got down to the part where you were inappropriately interfering with decisions regarding transfers and assignments, you did not recall or could not remember. This is the pattern of a person who is being less than credible.
>
> As I have previously discussed with you in our meeting of December 6, 2012, a lack of credibility in management personnel (or in any sworn peace officer) is detrimental to the Polk County Sheriff's Office and to law enforcement generally.
>
> It is unbelievable that a person can remember only the positive comments he makes and has forgotten all the negative comments. Your answers were evasive and you did not cooperate with the investigation.

Ex. C, App. 190–91.

On March 9, 2013, McCarthy transferred Charleston from his position as a day shift Patrol supervisor to a position as a Transport supervisor. A Transport sergeant's duties primarily involve

moving inmates and medical supplies between Iowa Department of Corrections facilities or hospitals. This position involves regular business hours (Monday through Friday, generally around 8 a.m. to 5 p.m., and no weekends or holidays). This transfer did not affect Charleston's base pay. Charleston lost a personally assigned patrol vehicle for on- and off-duty work due to the transfer. Charleston supervised 12 people in Patrol, but only 4 in Transport.

McCarthy states he transferred Charleston to Transport to alleviate concerns with Charleston's credibility. Those concerns stemmed largely from Charleston's termination from the Pomona Police Department for lying in a police report, and the OPS investigation finding that Charleston was untruthful.

**Procedural History**

On April 24, 2014, Charleston filed a four-count lawsuit against McCarthy and Munoz, as well as the Commissioners (Youngs, Buhr, and Hansen). Count I alleged McCarthy violated Charleston's First Amendment rights by discriminating, harassing, refusing to promote, and disciplining Charleston based on his political views, associations, and expressions. Count II alleged McCarthy violated Charleston's Due Process rights by failing to promote Charleston and promoting a candidate not on the Commission's promotion list in violation of Iowa Code § 341A.8. Count III alleged Munoz violated Charleston's First Amendment rights by recommending him to the Commission for discipline and by leaking his confidential employment information to the Des Moines Register due to his political views, associations, and expressions. Count IV alleged that Youngs, Buhr, and Hansen violated his Fourteenth Amendment rights by suspending him for two days when the evidence did not support his discipline.

On June 10, 2014, Defendants filed a pre-answer Motion to Dismiss. Judge Rose dismissed Counts II, III, and IV, and directed Charleston to amend his Complaint to correct ambiguities. The

Court found that Iowa's two-year statute of limitations for § 1983 claims barred any claim for actions prior to April 24, 2012 for Counts I, III, and IV. As for Count I, the only adverse employment actions Charleston sufficiently pled were his transfers and the failure to promote. The Court ordered Charleston to amend his Complaint to include specific dates he was passed over for a promotion. It also ordered him to amend his Complaint to distinguish between claims for First Amendment political discrimination and retaliation. The Court found that McCarthy was not entitled to qualified immunity for Charleston's transfers or his missed promotions. As for Count II, the Court dismissed Charleston's procedural Due Process claim because he had no property interest in a promotion. For Count III, the Court found that Charleston failed to allege an adverse employment action that fell within the two-year statute of limitations. The Court dismissed Count IV because it only related to events that occurred before April 24, 2012.

On August 26, 2014, Charleston filed a three-count Amended Complaint. Count I alleges McCarthy violated Charleston's First Amendment rights by discriminating against him based on his public views, associations, and expressions. Count II alleges McCarthy violated Charleston's First and Fourteenth Amendment rights by retaliating against him for his political associations. Count III alleges Munoz violated Charleston's First and Fourteenth Amendment rights by disclosing his private personnel records because he was running as a Republican.

On September 8, 2014, McCarthy and Munoz filed a second pre-answer Motion to Dismiss. Judge Rose held that Charleston sufficiently pled claims for political discrimination and retaliation in Counts I and II related to his transfers. Charleston also added and sufficiently pled a cumulative adverse employment action resulting from his "low performance appraisal scores, directing [Charleston] to increase his traffic enforcement in violation of Iowa law, giving [Charleston] a letter of reprimand for disrupting office harmony, and not allowing [Charleston] to attend

Department of Justice supervisor training." Order on Def.'s Mot. to Dismiss Pl's Am. Compl. 19, ECF No. [14] [*hereinafter* 2nd Order]. The Court repeated its holding that any claims related to events occurring before April 24, 2012 are time-barred. The Court held that Charleston failed to state a claim based on a failure to promote because all of the times he alleged he was passed over occurred before April 24, 2012. The Court clarified that any Due Process claim failed because Charleston had no property interest in a promotion. The Court also dismissed Count III of the Amended Complaint against Munoz with prejudice.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material when it might influence the outcome of an issue. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016). A dispute is genuine when a reasonable jury could find for the nonmoving party on an issue. *Id.* The court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in its favor. *Johnson Cty. v. Johnson Controls, Inc.*, 96 F. Supp. 3d 912, 916 (S.D. Iowa 2015). "To survive a motion for summary judgment, the nonmoving party must 'substantiate h[er] allegations with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy." *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 539 (8th Cir. 2014) (internal quotations and citations omitted). The Court is not obligated to wade ploddingly through the entire record in search of some possible fact that might support the nonmoving party's claim. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734–35 (8th Cir. 2009) ("It was not the District Court's responsibility to sift through the record to see if, perhaps, there was issue of fact"); *see also* LR 56(a), (b)(describing each respective party's

obligations in presenting or resisting a motion for summary judgment). It also is not the Court's role to weigh the evidence when deciding a motion for summary judgment. *Anderson*, 477 U.S. at 249; *Phelps v. Powers*, 63 F. Supp. 3d 943, 948 (S.D. Iowa 2014).

## DISCUSSION

The complexion of this case has changed significantly since it was filed in 2014. Those changes are in large part due to the Court's previous orders regarding two motions to dismiss filed by defendants. As a result of those orders, only Count I, for political discrimination, and Count II, for retaliation, against McCarthy remain in this case. The claims have been further modified and narrowed due to Charleston's concessions in his resistance brief and at oral argument. In his brief, Charleston concedes that he is not claiming the November 27, 2012 performance review, the May 2013 transfer to Court Staging, nor Charleston's non-participation in the PERF meeting constitute adverse employment actions. Pl.'s Br. 5, ECF No. [142-4]. During oral argument, Charleston's counsel further conceded that the only alleged adverse employment actions still at issue were (1) the February 15, 2013 reprimand, (2) the December 2012 refusal to reconsider the February 2012 two-day suspension, (3) the March 2013 transfer from Patrol to Court Transport, and (4) Charleston's exclusion from the 2013–2015 promotion list. Hr'g Tr. 20–22, ECF No. [159]. Furthermore, Charleston's counsel clarified that only the December 2012 refusal to reconsider the February 2012 two-day suspension constituted an adverse employment action in and of itself. Charleston argued that the remaining three incidents constituted an adverse employment action under a cumulative effects theory. Hr'g Tr. 22.

### First Amendment Political Discrimination and Retaliation Claims Analysis

"Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of the rights, privileges, or immunities secured by the Constitution and

laws of the United States." *Wagner v. Jones*, 664 F.3d 259, 268 (8th Cir. 2011) (citing 42 U.S.C. § 1983). Generally, the First Amendment bars a government employer from discriminating or retaliating against a public employee for his "political affiliation."[9] *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990). Political discrimination claims focus on an employee's affiliation, while retaliation claims center on an employee's conduct. *Wagner*, 664 F.3d at 269 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)).

To succeed on either a claim for political discrimination or retaliation, a plaintiff must first make a prima facie showing that he (1) "engaged in conduct protected by the First Amendment," (2) suffered an adverse employment action, and (3) a causal connection exits between the protected conduct and the adverse employment action ("the protected conduct was a substantial or motivating factor in the employer's decision to take the adverse employment action"). *Hughes v. Stottlemyre*, 506 F.3d 675, 678 (8th Cir. 2007) (retaliation claim); *Wagner*, 664 F.3d at 270 (political discrimination claim).

If a plaintiff succeeds on making the initial showing, under Eighth Circuit law the legal standard and analysis change depending on whether the court is reviewing a discrimination or retaliation claim.

In a political discrimination claim, the Eighth Circuit applies the *Mt. Healthy* analysis. *See Wagner*, 664 F.3d at 269–70; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). If a plaintiff has demonstrated a *prima facie* case of political discrimination, the burden of persuasion shifts under the *Mt. Healthy* analysis and the employer must prove by a preponderance of the evidence that it would have made the same adverse employment decision absent the employee's political affiliation. *Wagner*, 664 F.3d at 270–71. If the employer cannot

---

[9] The Supreme Court has laid out an exception to this rule for policymaking or confidential employees, but neither party asserts that the exception applies to this case.

meet this burden, the employee wins. *Id.* at 270 (quoting *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir. 1993)).

For a First Amendment retaliation claim, the burden-shifting framework depends on the plaintiff's evidence.[10] During oral argument, Charleston admitted that this was not a direct evidence case. Hr'g Tr. 46–47. A retaliation case involving direct evidence of discrimination uses the *Mt. Healthy* burden-shifting analysis discussed above, while a case involving indirect evidence uses the *McDonnell Douglas* burden-shifting framework.[11] *Graning v. Sherburne Cty.*, 172 F.3d 611, 615 n.3 (8th Cir. 1999) ("The so-called mixed motive analysis under *Mt. Healthy* is only used if a complainant has comes forward with evidence that directly reflects the use of an illegitimate criterion in the challenged decision.") (quotations and citations omitted); *Carroll v. U.S. Dep't of Labor*, 78 F.3d 352, 357 (8th Cir. 1996); *see also Davison v. City of Minneapolis*, 490 F.3d 648, 662–64 (8th Cir. 2007) (Colloton, J., dissenting) (noting that *McDonnell Douglas* applies in indirect cases and *Mt. Healthy* applies in direct cases); *Hughes*, 506 F.3d at 678 n.4 (citing *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007)). Under the *McDonnell*

---

[10] The Court disagrees with Charleston's argument that the same standard applies to both claims. The Eighth Circuit is the only court of appeals to analyze First Amendment retaliation claims using different frameworks for retaliation cases based on direct and indirect evidence. *Walton v. Powell*, 821 F.3d 1204, 1210 (10th Cir. 2016). Retaliation cases involving indirect evidence use the *McDonnell Douglas* burden-shifting frame, while courts employ the *Mt. Healthy* affirmative defense in retaliation cases with direct evidence. *See Williams v. Tucker*, 857 F.3d 765, 768 (8th Cir. 2017) ("To avoid summary judgment on that retaliation claim, she must present 'direct evidence' of retaliation or follow 'the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).'"). The Eighth Circuit uses the *Mt. Healthy* analysis in political discrimination cases. *Wagner*, 664 F.3d 271–73.

As the Court will discuss below, this case involves indirect evidence that McCarthy retaliated against Charleston for running for sheriff. Thus, the undersigned will analyze the retaliation claim under the *McDonnell Douglas* burden-shifting framework and the political discrimination claim under the *Mt. Healthy* framework.

[11] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. This must be strong evidence that clearly points to the presence of an illegal motive. Examples of direct evidence, in the context of sex and race discrimination, respectively, include a statement by the employer that 'no woman would be named to a B scheduled job,' or a statement by the person responsible for promotion decisions that 'if it was his company, he wouldn't hire any black people.' By contrast, statements by decision makers unrelated to the decisional process itself do not constitute direct evidence of discrimination." *Davison v. City of Minneapolis*, 490 F.3d 648, 664 (8th Cir. 2007) (Colloton, J., dissenting) (internal quotations and citations omitted).

*Douglas* burden-shifting analysis, only the burden of production shifts to the defendant. *Hughes*, 506 F.3d at 679. After the burden shifts, "a presumption of retaliation arises, and the burden of production shifts to the employer to advance a legitimate reason for the employment action." *Id.*

After an employer advances a legitimate, nondiscriminatory reason for the adverse employment action, the *McDonnell Douglas* burden-shifting requires the employee to prove the employer's justification is "unworthy of credence" and a pretext for retaliation *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008). An employee may show an employer's reason is pretext by presenting "evidence that an employer has proffered an explanation with no basis in fact, evidence that the plaintiffs recently received favorable reviews, or . . . evidence that the employer's proffered reason for its employment decision has changed substantially over time." *Id.* In *McDonnell Douglas*, the burden of persuasion stays with the plaintiff. *Hughes*, 506 F.3d at 679. Ultimately, the employee must prove that impermissible retaliation was a substantial or motivating factor with respect to the adverse employment action at issue.[12]

### Prima Facie Case

### Protected Activity

For purposes of this Motion, McCarthy appears to agree that Charleston can establish that he engaged in protected activity. With respect to the political discrimination claim, the protected activity is Charleston's association with the Republican Party. *Rutan*, 497 U.S. at 78. With respect to the retaliation claim, the protected activity is Charleston's campaign for sheriff. *Shockency v. Ramsey Cty.*, 493 F.3d 941, 948 (8th Cir. 2007).

---

[12] The Court is aware that the United States Supreme Court held that Title VII retaliation claims must be proved according to traditional principles of "but for" causation, not the lessened "motivating or substantial factor" test. *University of Tex. Southwestern Med. Cir. v. Nassar*, 133 S. Ct. 2517 (2013). Neither party has argued that the Court should apply a "but for" causation test with respect to the First Amendment retaliation claim. Nor has the Court found in its own research any Eighth Circuit cases extending the "but for" causation standard to First Amendment retaliation cases.

McCarthy argues that Charleston abandoned his claim for political discrimination during his deposition by failing to distinguish between his political discrimination claim for being a Republican and his retaliation claim for running against McCarthy. Charleston argues that the same facts support both claims. The difference is the focus of the claim, with retaliation focused on plaintiff's actions and discrimination focused on political affiliation. The undersigned finds that Charleston did not waive his political discrimination claim based on the deposition questions and response McCarthy cited. Def.'s Statement of Undisputed Material Facts ¶ 1, ECF No. [130-1]. However, Charleston made a critical concession in that deposition testimony when he admitted that he had no evidence that his political affiliation as a Republican caused or was connected to any of the adverse employment actions of which he complains. Def. App. [130-8] PC MSJ0547-0548. Nor does the record contain any evidence that Charleston's status as a Republican played any role in the alleged adverse actions. Accordingly, Charleston has not presented any evidence that would allow a jury to find in his favor on the political discrimination claim[13].

**Adverse Employment Actions**

To bring a claim for either political discrimination or retaliation, an employee must have suffered an adverse employment action. *Wagner*, 664 F.3d at 270. "Changes in employment duties or conditions that cause material disadvantage to the employee constitute adverse employment actions, but tangential changes do not." *Shockency*, 493 F.3d at 948. Actions that individually fall below this standard can still constitute adverse employment actions "if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine his position." *Id.*

---

[13] In an abundance of caution and because the *prima facie* case analysis is the same for the political discrimination and retaliation claim, the discussion on the flaws in Charleston's *prima facie* case apply to both claims.

Charleston alleges he suffered an adverse employment action when McCarthy failed to rescind Charleston's February 2012 suspension in December 2012 after it became clear that the decedent's estate would not sue Polk County.[14] Charleston also alleges that the following actions, when viewed together, constitute a cumulative-effect adverse employment action: (1) McCarthy reprimanded Charleston in February 2013; (2) McCarthy transferred Charleston from Patrol to Transport in March 2013; (3) Charleston's supervisor gave him a low November 2012 appraisal rating; and (4) Charleston was left off the 2013-2015 promotion list.[15]

### *Failure to Rescind Suspension*

Charleston argues that McCarthy's failure to rescind the suspension in December 2012—after both parties learned that the decedent's estate was not planning to sue Polk County for Charleston's failure to provide medical assistance—was an adverse employment action. He argues that, viewing the facts in the light most favorable to Charleston, the suspension was unwarranted after the Medical Examiner determined in October 2012 that Charleston and the other deputy could not have saved Brennan, and McCarthy has not identified any procedural rules that Charleston violated during the incident.

McCarthy argues Charleston failed to provide facts sufficient to produce a genuine issue of material fact as to whether this was an adverse employment action. McCarthy asserts Charleston's evidence and cases do not support the argument that the failure to rescind was an

---

[14] During oral argument, Charleston conceded that only the December 2012 non-rescission decision constituted an adverse employment action in and of itself. Hr'g Tr. at 22.

[15] In his brief, Charleston conceded that he was not relying on the November 2012 appraisal as part of his adverse employment action argument. Pl.'s Br.  5, ECF No. [142-4]. At the start of Charleston's oral argument, the Court asked plaintiff's counsel what alleged actions were still at issue. Plaintiff's counsel did not identify the November 2012 appraisal as still in the case. Hr'g Tr. at 21–22. During argument, however, plaintiff's counsel argued that the Court should consider the November 2012 appraisal in the analysis of the "cumulative effects" argument. Hr'g Tr. at 38–40. Although the undersigned believes Charleston has waived the argument that the November 2012 appraisal is still in the case, in an abundance of caution, the Court will consider the appraisal in its analysis of Charleston's cumulative effects theory.

adverse employment action. He also argues that Judge Rose's August 12, 2014 2nd Order dismissed this claim. McCarthy notes that time-barred events may provide background in Title VII hostile work environment cases, but argues that this case is distinguishable. McCarthy also asserts that he operated on the belief that the 2012 suspension was time-barred, thus considering it in this Motion or at trial would be prejudicial.

Charleston's claim that McCarthy's failure to rescind the suspension in December 2012 constituted an adverse employment action is time-barred. "[W]here the injury suffered beyond the reach of the statute of limitations is 'clear' and actionable, the time-barred claim cannot be revived under the continuing violation doctrine." Order on Def.'s Mot. to Dismiss Pl.'s Compl. 8, ECF No. [9] [*hereinafter* 1st Order] (citing *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008)). Although the parties received the Medical Examiner's report in October 2012 and learned that the decedent's estate was not planning to sue Polk County in December 2012, the suspension was a discrete event with an effect that lingered, not a continuing violation. The Court considered Charleston's claim that McCarthy should have rescinded the suspension in light of the Medical Examiner's report and held that it was time-barred. 2nd Order at 17 n.4 ("[T]he Complaint made clear its reliance on events occurring in October 2012 to extend the time available with which to file suit. The Court nevertheless concluded that the February 2012 suspension, which was allegedly in retaliation for Charleston's political activity, was clear and actionable in February 2012, and so portions of the Complaint stemming from the suspension were dismissed as barred by the statute of limitations.").

The undersigned reaffirms the Court's previous holding. Charleston pled McCarthy's failure to rescind his suspension in paragraph 37 of his Amended Complaint. Am. Compl. ¶ 37, ECF No. [10] ("Despite this, neither McCarthy nor his agent and attorney Kuhle moved to rescind

the two day suspension."). Charleston's failure-to-rescind claim stems from his suspension because the failure to rescind could not exist if McCarthy had not suspended Charleston. Charleston has not provided the Court with any reason why December 2012 should be any different from October 2012. The undersigned finds that Charleston's failure-to-rescind claim is time-barred because it stems from, and only exists because of, his February 2012 suspension.[16]

Even if the undersigned were to further consider Charleston's failure-to-rescind claim, McCarthy's failure did not tangibly change Charleston's employment duties or conditions in December 2012, as the definition of an adverse employment action requires.[17] *See Schoonover v. Schneider Nat'l. Carriers, Inc.*, 492 F. Supp. 2d 1103, 1133 (S.D. Iowa 2007) (requiring a tangible change). Charleston did not discover or suffer any additional adverse consequences—consequences he would not have otherwise faced or was unaware of—because of McCarthy's failure. To hold otherwise would eviscerate the statute of limitations by allowing an employee to revive any time-barred employment decision by claiming to have new information even if the new information did not reveal an undiscovered injury. Charleston's claim based on McCarthy's failure in December 2012 to rescind Charleston's two-day suspension fails because it is time-barred, it is not a continuing violation, and it fails to qualify as an adverse employment action.

### *Cumulative Adverse Employment Action*

Charleston argues that his 2012 appraisal, his February 2013 reprimand, his March 2013 transfer to Transport, and McCarthy's failure to rescind Charleston's suspension cumulatively

---

[16] Because Charleston's failure-to-rescind claim is time-barred, the undersigned need not consider whether his suspension was warranted.

[17] The Court also finds that the record does not contain sufficient evidence that would allow it to find McCarthy's failure to rescind was an adverse action. The record does not indicate whether McCarthy had the authority to rescind the suspension, or whether he had to recommend a rescission to the Commission. The record lacks any evidence about the process, standards, or possible outcomes associated with attempting to rescind Charleston's suspension. It would be impossible for the Court to conclude that McCarthy's failure to rescind the suspension had any effect on Charleston because it is unaware that McCarthy was even able to rescind the suspension.

constitute an adverse employment action because Charleston lost (1) job responsibilities, (2) his patrol vehicle, (3) overtime pay eligibility , and (4) a place on the 2013 lieutenant promotion list.

McCarthy argues that the cumulative effect of the actions listed above cannot be an adverse employment action because the actions, even considered jointly, did not cause a serious employment consequence that adversely affected Charleston's positon. McCarthy asserts the appraisal, reprimand, and transfer did not cause Charleston any harm, and that Charleston's own actions caused any harm. McCarthy contends that Charleston failed to present evidence sufficient to develop a genuine issue of material fact concerning his cumulative adverse employment action theory.

"Lesser actions than demotion, suspension, and termination can be adverse employment actions if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine his position." *Shockency*, 493 F.3d at 948 (quoting *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997)). In *Kim*, the employee alleged that the employer "had systematically retaliated against him, that is, that all the acts were taken in response to his filing the employment discrimination charge and were thus connected to one another." *Kim*, 123 F.3d at 1060. The Eighth Circuit held that "as a matter of law, [the employer's] conduct, which included reduction of duties, disciplinary action and negative personnel reports, as well as required remedial training, constituted adverse employment action." *Id.*

The Court first looks at the 2012 appraisal. On November 27, 2012, James Brown, Charleston's direct supervisor at the time, rated Charleston a 2.14 on a scale of 1 ("Needs Improvement") to 3 ("Exceeds Expectations") on his yearly performance appraisal.[18] In the

---

[18] All Sheriff's Office employees receive yearly appraisals scoring their performance and providing feedback near the anniversary of the date they were promoted to their current rank. Charleston usually receives his appraisals around November of each year. In 2005, Charleston scored a 2.128. In 2006, he scored a 2.81. In 2007 and 2008,

"Specific Performance Objectives" section of the appraisal, Brown wrote, "I would like to see Sgt. Charleston take a more proactive approach as it comes to Patrol functions and duties which also include traffic enforcement." Ex. A, App. 163. Charleston was not disciplined for this appraisal, nor was he required to complete remedial training. Charleston still received a merit-based raise in 2012.

The Court next considers the reprimand and its impact on the cumulative effects theory. "'A reprimand is an adverse employment action only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse.'" *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015) (quoting *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1058 (8th Cir. 2007)).

Charleston's reprimand did not affect the terms or conditions of Charleston's employment. His base pay, merit raises, and benefits all stayed the same. His job duties remained the same as well. The Sheriff's Office considers a reprimand "discipline," Ex. HH, App. 510–11, but it did not change the terms or conditions of Charleston's employment.[19] Without a detrimental change, the undersigned finds that Charleston's reprimand was not an adverse employment action, even when considered in light of the other complained-of actions. Charleston urges the Court to consider the *effect* of the untimely suspension as background information to Charleston's cumulative adverse action claim. "[P]roof of a continuing violation does not expand the period for which plaintiff may recover damages, but evidence of harassment occurring prior to the statute of limitations period may be admissible to prove that conduct within that period is actionable because it was part of an

Charleston scored a 2.73. In 2009, he scored a 2.5. In 2010, he scored a 2.47. Charleston did not receive a Performance Evaluation score in 2011. In 2013, Charleston scored a 2.6.

[19] Charleston agreed that one reprimand would probably not affect his chances of being on the promotion list, but he argues that McCarthy reprimanded him knowing that the combination of this reprimand with Charleston's other disciplinary history would keep him off the 2013 promotion list. Charleston Dep. 121:2–23, App. 576. However, Charleston failed to provide sufficient evidence to generate a genuine issue of material fact as to what kept him off the 2013 promotion list. See the discussion below for a full explanation of this issue.

unlawful continuing violation." *Dains v. Curators of Univ. of Mo.*, 29 F. App'x 425, 426 (8th Cir. 2002). However, as the undersigned discussed above, the continuing violation doctrine does not apply to the suspension because it was a discrete, individually actionable event. If the Court were to consider the time-barred suspension's effect when determining whether Charleston suffered a cumulative adverse employment action, it would be including the suspension itself in the cumulative adverse employment action because it is a discrete event, not an ongoing one. This would expand the time for which Charleston may recover damages. Even if the suspension is relevant to the context of this case, it is not part of a cumulative adverse employment action because its effects stem from a discrete, time-barred adverse employment action, rather than a continuing violation. *See Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 805 (7th Cir. 2008).[20]

Charleston claims that because of McCarthy's pattern of discrimination and retaliation, Charleston lost job responsibilities, his patrol vehicle, overtime pay eligibility, and his place on the 2013 lieutenant promotion list. The undersigned first notes that there is insufficient evidence in the record to create a genuine issue of material fact as to whether McCarthy's actions caused the Commission to leave Charleston off the lieutenant's promotion list. The only evidence that Charleston cites to support his assertion is his own belief. Charleston Dep. 120:13–121:23, App. 575–76; *see also* Pl.'s Statement of Facts ¶ 24, ECF No. [142-2]. Charleston also admits that one reprimand would not keep him off the promotion list. Charleston Dep., 121:2–6. The record

---

[20] "[Plaintiff] claims that the harmful effects 'lingered' into the limitations period by depressing the eventual sale price of the property. But this is another misuse of the 'continuing violation' doctrine. The discrimination injured [Plaintiff] in 1993 and the statute of limitations began to run then. If subsequent discriminatory acts caused additional injury, the limitations period for suing on those acts accrued when the additional injury was discovered. The last of those acts occurred in 2003, more than two years before the suit was filed, and (if the complaint can be believed) they injured [Plaintiff] by impeding the development and, failing that, the sale of its property at a good price. That injury started the statute of limitations running. As we said earlier, difficulty in quantifying damages may sometimes be a basis for equitable tolling, but it does not postpone the start of the limitations period. Not the extent, but the fact, of injury starts the period running." *Limestone Dev. Corp.*, 520 F.3d at 805.

suggests the Commission determines who is on the list, in part by considering an employee's disciplinary history. *See id.* 120:13–121:23. The record also suggests that the Commission or Sheriff's Office administers a test that affects placement on the list. Peterman Aff., App. 86. The record lacks evidence of the Commission's decision-making process, the types and weight of information the Commission considers, or the qualifications and disciplinary histories of the other sergeants. Without this information, Charleston has failed to raise a genuine issue of material fact as to whether McCarthy's actions kept him off the 2013 promotion list.

The three remaining adverse effects—Charleston's lost job responsibilities, patrol vehicle, and alleged overtime pay eligibility—all stem from Charleston's March 2013 transfer to Transport. Charleston admitted that the work in Transport involved essential functions of the Sheriff's Office, required seasoned supervisors, was as important as other positions in the Sheriff's office, and was not punitive work. Def.'s Statement of Undisputed Facts ¶ 102, Pl.'s Response to Def.'s Statement of Undisputed Facts ¶ 102. Charleston stated during his deposition that he was still able to work overtime, but that it was more inconvenient without a patrol car. Charleston only remained in Transport for approximately 2.5 months and was then transferred to Court Staging. "A transfer constitutes an adverse employment action when the transfer results in a significant change in working conditions or a diminution in the transferred employee's title, salary, or benefits." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 919 (8th Cir. 2000). A transfers that involves "minor changes in working conditions and does not involve a reduction in pay or benefits" is not an adverse employment action. *Jones v. Fitzgerald*, 285 F.3d 705, 714 (8th Cir. 2002).

The changes to Charleston's job duties and responsibilities are tangential and fall below the standard for an adverse employment action, even when considered as part of the cumulative effects theory. Charleston has failed to create a genuine issue of material fact regarding whether

he suffered an adverse employment action, under either an individual action theory or a cumulative effects theory. Thus, both his political discrimination and retaliation claims fail and the Court could end its analysis at this point. The undersigned, however, will further analyze whether Charleston has produced a *prima facie* case on either claim.

## Causal Connection

Charleston argues that the December 2012 failure to rescind the earlier suspension and the actions that formed the basis for his cumulative effects theory are both causally connected to Charleston's protected activities of being a Republican and/or running for sheriff against McCarthy. To satisfy this element, a discriminatory motive must have played a part in the complained-of adverse employment action. *Wagner*, 664 F.3d at 271. To the extent that any alleged adverse action occurred after Charleston announced his decision to run as a Republican candidate for sheriff against McCarthy, there is a temporal link established. Generally, however, a court cannot infer causation based on temporal proximity alone. *Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008).

To support his obligation to establish a causal connection, Charleston claims that the following events establish that McCarthy exhibited an animus towards Charleston based on his political affiliation and campaign for sheriff: (1) McCarthy's accusations that Charleston leaked personnel information during the campaign, (2) McCarthy's failure to discipline Phillips when he shared Charleston's personnel file information with the Des Moines Register, and (3) when viewed in the light most favorable to Charleston, he was truthful with the investigators during his OPS investigation. Charleston also asserts that McCarthy's statements during the December 6, 2012, and February 15, 2013, meeting (allegedly calling Charleston a cancer for 18 months, calling him

a shadow sheriff, and McCarthy agreeing he told Charleston he would attempt to decertify him) demonstrate a discriminatory/retaliatory animus

Presumably, Charleston's argument is that the events in the preceding paragraph demonstrate that McCarthy did not like Charleston (and thus blamed Charleston for events that occurred and did not punish others who took actions that negatively impacted Charleston during the sheriff's campaign) and that this dislike establishes that every employment action taken against Charleston was causally connected to the campaign or Charleston's political affiliation. The record does not support that argument. One of the key problems with Charleston's argument is that he has not connected the events listed in the preceding paragraph with the specific alleged adverse actions remaining in the case, (namely the December 2012 failure to rescind the previous February 2012 suspension and the three actions forming the basis for his cumulative effects theory ((1) the February 15, 2013 reprimand, (2) the March 2013 transfer from Patrol to Court Transport, and (3) Charleston's exclusion from the 2013-2015 promotion list)) to show the required causal connection between those adverse actions and any protected activity

The summary judgment record does not establish a causal connection between the December 2012 failure to rescind the February 2012 suspension and any protected activity. The record establishes that the Altoona Fire Chief filed a complaint with the Sheriff's Office alleging that Charleston and the other deputy on the scene failed to assist a dying citizen. McCarthy ordered OPS to investigate, Harney recommended a three-day suspension, and Tunks recommended a two-day suspension. Charleston appealed Tunks' recommendation to McCarthy, who imposed the two-day suspension. McCarthy cited specific provisions of the Sheriff's Office General Orders that Charleston violated. Charleston appealed McCarthy's decision to the Commission, who found that Charleston violated the General Orders and determined that a two-day suspension was appropriate.

There is nothing in the record to show political factors influenced McCarthy's decision to impose the suspension. McCarthy did not independently determine the length of Charleston's suspension; he reviewed the record and found Tunks' suggestion appropriate. The Commission also reviewed and approved of McCarthy's decision.

On the summary judgment record, a reasonable jury could not find that McCarthy's accusation that Charleston leaked personnel information to the public is evidence of causal connection between the protected activity and the actions forming the basis of the cumulative effects adverse action. On April 10, 2012, McCarthy sent Charleston a memo about a radio interview Charleston had done. See Ex. TT, App. 615. A person called into the radio show and asked Charleston about an alleged theft by a Sheriff's Office employee from a casino. McCarthy told Charleston that his response was inappropriate and insinuated that Charleston knew the person would call. McCarthy insinuated during his deposition on December 20, 2016, that Charleston leaked the story. McCarthy Dep. 28:21–29:7, App. 625–26. Viewing the evidence in the light most favorable to Charleston, McCarthy believes Charleston leaked the story during the campaign. However, the record does not establish any connections between McCarthy's belief and the actions of which Charleston now complains in his cumulative effects theory, most of which occurred more than 6 months after the alleged leak.

Likewise the record does not establish that McCarthy's failure to punish Phillips for informing the Des Moines Register about Charleston's Pomona termination creates a causal connection between any protected activity and alleged adverse actions still at issue.

Similarly, the OPS investigation does not create the required causal link. McCarthy recommended that OPS investigate Charleston, but he did not participate beyond meeting with Charleston on February 15, 2012, and making the decision to reprimand him, rather than impose

harsher discipline. Shoemaker's and Peterman's recommendations included termination, and Brown's was a five-day suspension and demotion. Despite these recommendations, McCarthy chose only to reprimand Charleston. Each of these individuals also determined that Charleston was untruthful or withheld information from the OPS investigators. Regardless of whether a court would find that, when viewing the facts in the light most favorable to Charleston, he was honest with the OPS investigators, Charleston's three supervisors perceived and reported that Charleston was less than credible with the OPS investigators. Furthermore, McCarthy chose to give Charleston a lighter punishment than Charleston's supervisors recommended. Charleston has not pointed the Court to any record citations that tie the investigation and resulting disciplinary action to political party affiliation or Charleston's campaign for sheriff.

Charleston argues that McCarthy's statement telling Charleston "you're like a cancer in this building, and you have operated that way for 18 months" is evidence of causation. Tr. of Dec. 6, 2013 Meeting 37:5–38:9, App 377. This appears to be Charleston's best evidence of a causal connection between a protected activity and an alleged adverse action. On its face, the statement does not refer to either the campaign for sheriff or Charleston's political affiliation. Viewing the statement in the light most favorable to Charleston, McCarthy's reference to 18 months ties the statement to the period that the two were campaigning for sheriff. Charleston also contends that McCarthy telling Charleston that he would not allow him to operate as a shadow sheriff is further evidence of causation. In the context of the meeting on December 6, 2012, McCarthy was telling Charleston that he would not allow Charleston to exercise any supervisory authority beyond that of a typical sergeant. Even if McCarthy's statements about "being a cancer" and "shadow sheriff" implicate the time when Charleston was campaigning for sheriff, the Court must still view them in context, including McCarthy's statements that Charleston had a job at the Sheriff's Office as

long as he did his job. Not every statement that McCarthy made that referred to the campaign timeframe evidenced a discriminatory or retaliatory motive. Charleston has not shown on the record that these statements demonstrate the required causal connection between the sheriff's campaign or his political affiliation and the complained-of employment actions still at issue (namely the December 2012 failure to rescind the previous February 2012 suspension and the three actions forming the basis for his cumulative effects theory ((1) the February 15, 2013 reprimand, (2) the March 2013 transfer from Patrol to Court Transport, and (3) Charleston's exclusion from the 2013–2015 promotion list).

A similar problem exists regarding McCarthy allegedly telling Charleston that he was going to attempt to decertify him. The only evidence that McCarthy ever told Charleston he was going to decertify him was during the February 15 meeting in this context:

> Charleston: You want, you wanna, you've already told me that in past meetings that I'm cancerous, I'm a liar, you don't trust me, *you want to decertify me*, that's just part of your process. So I understand that.
> McCarthy: I have said those things and but I also tell you that I have mixed feelings and I maintain there is a place here for you even with that background that you have that I believe should prohibit you from being in law enforcement, but you're here.

Tr. of Feb. 15, 2013 Meeting, App. 295–96 (emphasis added). There is no other evidence in the record of McCarthy telling Charleston he was going to decertify him. Nor of McCarthy taking any actions related to decertification. Viewing the evidence in the light most favorable to Charleston, McCarthy agreed that he had said he was going to decertify Charleston at some time in the past. However, McCarthy told Charleston that he had a job at the Sheriff's Office, and that McCarthy would not take it away if Charleston did his job. Given the context of the statement, the record does not establish the required nexus between this statement and the limited adverse actions still at issue.

Because Charleston has not carried his burden to prove or raise genuine issues of material fact on each element of a *prima facie* case of political discrimination or retaliation, his claims fail and McCarthy is entitled to summary judgment on both claims.

### Burden Shifting Analysis

Even though Charleston did not present sufficient evidence to establish a *prima facie* case of retaliation, McCarthy has asserted on the record a legitimate, nondiscriminatory reason for each of the adverse actions at issue. *Wagner*, 664 F.3d at 270 (political discrimination claim); *Hughes*, 506 F.3d at 679 (retaliation claim).

With regard to the retaliation claim, Charleston bears the burden of proving the employer's justification is "unworthy of credence" and is a pretext for retaliation *Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008). An employee may discredit an employer's proffered reason by proving that it is pretext for illegal discrimination. *Id.* "Pretext may be shown with evidence that an employer has proffered an explanation with no basis in fact, with evidence that the plaintiffs recently received favorable reviews, or with evidence that the employer's proffered reason for its employment decision has changed substantially over time." *Id.* In *McDonnell Douglas*, the burden of persuasion stays with the plaintiff. *Hughes*, 506 F.3d at 679. The record does not establish that the proffered reasons are unworthy of credence and that the true basis for the adverse employment action was retaliation for actions taken by Charleston related to the sheriff's campaign.

Furthermore, because Charleston conceded that he had no evidence tying his political affiliation to any of the alleged adverse actions, the undersigned does not need to reach the *Mt. Healthy* burden-shifting analysis on the political discrimination claim.

**Punitive Damages**

A jury may award punitive damages in a § 1983 case when the defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). However, punitive damages are not appropriate when the plaintiff's underlying claims fail. *See Feltmann v. Sieben*, 108 F.3d 970, 977 (8th Cir. 1997); *Hill v. Scott*, No. Civ. 01-1023PAMRLE, 2002 WL 1949749, at *4 (D. Minn. Aug. 19, 2002), aff'd, 349 F.3d 1068 (8th Cir. 2003). Because both of Charleston's underlying claims fail, so must his claim for punitive damages.

**CONCLUSION AND ORDER**

After a thorough review of the record in the light most favorable to Charleston, the undersigned respectfully recommends that the Court **grant** McCarthy's Motion for Summary Judgment, ECF No. [130], as to both of Charleston's remaining claims.

IT IS ORDERED that the parties have until **January 2, 2018** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). A party's objection must identify the specific portions of the Report and Recommendation it objects to, along with the relevant portions of the record, and must set forth the basis for those objections. *See* FED. R. CIV. P. 72; *Thompson*, 897 F.2d at 357. A party's failure to timely object may waive its right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 19th day of December, 2017.

Helen C. Adams
Chief U.S. Magistrate Judge